DORIS HERMES CRUMPLER MAYER v. VICTOR MAYER

No. 8221DC668

(Filed 21 February 1984)

1. **Divorce and Alimony § 28— refusal to accord legal force and effect to Dominican divorce proper**

   For both jurisdictional and public policy reasons, the trial court properly refused to accord legal force and effect to a Dominican divorce decree since (1) the divorce was "ex parte," (2) divorces granted in foreign countries to persons who are domiciliaries of the United States are not valid and enforceable, and (3) the Dominican Republic's "quickie" divorces offend this State's public policy against the hasty dissolution of marriages.

2. **Marriage § 5— second "husband" estopped from asserting invalidity of former divorce decree**

   Defendant-"husband" is estopped from questioning plaintiff-"wife's" Dominican Republic divorce from an earlier husband since (a) he participated in her procurement of the invalid divorce; (b) all parties relied upon the divorce's validity until defendant abandoned plaintiff; and (c) a contrary result would create a marriage at will by defendant, who could end the marital relationship at any time he desired, and yet prevent plaintiff from avoiding the obligations of her remarriage. The record suggested that defendant insisted on plaintiff's obtaining a Dominican divorce; that a promise to support her in the manner better than the one she had been accustomed to prompted plaintiff to sign away any alimony she might have had from her former husband; and that he accompanied her on her trip to the Dominican Republic, paying for her transportation and lodging, and other personal expenses. After the divorce, the defendant continued to uphold its validity as he had plaintiff sign a prenuptial agreement and then married her. When they were married, defendant lived in plaintiff's house and borrowed money from her, including $25,000.00 which he admits he has not repaid. Defendant never questioned the validity of the marriage until he abandoned plaintiff, and plaintiff relied on the divorce's validity.

APPEAL by plaintiff from *Tash, Judge.* Judgment entered 20 January 1982 *nunc pro tunc* 23 March 1982 in District Court, FOR-SYTH County. Heard in the Court of Appeals 10 May 1983.

*Lewis & Bowden, by Michael J. Lewis, for plaintiff appellant.*

*Smith, Moore, Smith, Schell & Hunter, by James A. Medford and Robert H. Slater, for defendant appellee.*

BECTON, Judge.

This case involves a challenge to a Dominican Republic (Dominican) divorce decree by Victor Mayer, who asserts that his wife's divorce from her first husband, which he actively helped procure, was invalid, and who thereby seeks to avoid paying alimony to his wife. We hold (1) that, although the Dominican divorce decree is invalid, Victor Mayer, based on the facts of this case, is estopped from asserting its invalidity; and (2) that Victor Mayer is estopped from avoiding the consequences of his contract of marriage with Doris Mayer.

It may have been easier for us to have declared the Dominican divorce voidable and challengable only by Doris Mayer's first husband, Fred Crumpler, especially since we hold in part IV, *infra,* that Victor Mayer is estopped from asserting any invalidity in the Dominican proceedings. *See Carpenter v. Carpenter,* 244 N.C. 286, 93 S.E. 2d 617 (1956). We, however, have decided to address the issues "head-on" because of a demonstrated need[1] to definitively resolve questions about "quickie" foreign divorces—that is,

the concept of foreign country migratory divorces for American domiciliaries—with its jurisdictional and public pol-

---

1. See, for example, the following articles set forth in Swisher, *Foreign Migratory Divorces: A Reappraisal,* 21 J. Fam. L. 9 (1982-83).

Clark, *Estoppel Against Jurisdictional Attack on Decrees of Divorce,* 70 Yale L. J. 45 (1960); Currie, *Suitcase Divorce in the Conflict of Laws: Simon, Rosenthiel and Borax,* 34 U. Chi. L. Rev. 26 (1966); Foster, *Recognition of Migratory Divorces: Rosenthiel v. Section 250,* 43 N.Y.U. L. Rev. 429 (1968); Garfield, *The Transitory Divorce Action: Jurisdiction in the No-Fault Era,* 58 Tex. L. Rev. 501 (1980); Leach, *Divorce by Plane-Ticket in the Affluent Society—With a Side Order of Jurisprudence,* 14 Kan. L. Rev. 549 (1966); Lipstein, *Recognition of Foreign Divorces: Retrospects and Prospects,* 2 Ottawa L. Rev. 49 (1967); Peterson, *Foreign*

icy defects; its alleged 'defense' of estoppel; and with one exception piled upon another—has become so confusing to the lay public and the practicing bar that very few people adequately understand the underlying ramifications and liabilities involved in such divorces.

Swisher, *Foreign Migratory Divorces: A Reappraisal,* 21 J. Fam. L. 9 (1982-83).

I

*Procedural History*

Praying for divorce from bed and board, permanent alimony, and alimony *pendente lite,* Doris Mayer filed her complaint against Victor Mayer on 15 October 1981. Denying that he was lawfully married to Doris Mayer, and counter-claiming for an annulment, Victor Mayer, in his answer, specifically asserted that at the time of his purported marriage, Doris Mayer was already married to Fred Crumpler; that she had previously attempted to divorce Fred Crumpler by obtaining a divorce decree from a Dominican court; that the Dominican divorce decree was void and in contravention of the laws of North Carolina; and that Doris Mayer knew this, having been so advised by counsel.

This case was heard in the trial court upon Doris Mayer's motions for alimony *pendente lite* and attorney's fees. At the close of Doris Mayer's evidence, the trial court denied the mo-

*Country Judgments and the Second Restatement of Conflict of Laws,* 72 Colum. L. Rev. 220 (1972); Peterson, *Res Judicata and Foreign Country Judgments,* 24 Ohio St. L. J. 291 (1963); Phillips, *Equitable Preclusion of Jurisdictional Attacks on Void Divorces,* 37 Fordham L. Rev. 355 (1969); Rosenberg, *How Void is a Void Decree, or The Estoppel Effect of Invalid Divorce Decrees,* 8 Fam. L. Q. 207 (1974); Note, *Domestic Relations Jurisdiction—Extension of Comity to Foreign Nation Divorce,* 46 Tenn. L. Rev. 238 (1978); Note, *United States Recognition of Foreign, Nonjudicial Divorces,* 53 Minn. L. Rev. 612 (1969); Comment, *Mexican Divorces: Are They Recognized in California?,* 4 Cal. W. L. Rev. 341 (1968); Comment, *Mexican Divorce—A Survey,* 33 Fordham L. Rev. 449 (1965).

See also Annot., *Domestic Recognition of Divorce Decree Obtained in Foreign Country and Attacked for Lack of Domicile or Jurisdiction of the Parties,* 13 A.L.R. 3d 1419 (1967).

*Id.* at 9 n. 1.

tions, after determining (a) that the Dominican divorce was invalid; (b) that the Mayers' marriage was void; and (c) that Victor Mayer was not estopped from denying the validity of Doris Mayer's divorce. Doris Mayer appeals.

## II

*Appealability*

Initially, both parties direct our attention to *Fliehr v. Fliehr,* 56 N.C. App. 465, 289 S.E. 2d 105 (1982) and *Stephenson v. Stephenson,* 55 N.C. App. 250, 285 S.E. 2d 281 (1981), which hold that orders for alimony *pendente lite* are interlocutory and not immediately appealable. Although this Court expressed its concern about the "backlog of appeals" in *Fliehr* and *Stephenson,* the primary rationale underlying those decisions is that appeals should not be taken to delay execution of district court orders for alimony *pendente lite. Fliehr,* 56 N.C. App. at 466, 289 S.E. 2d at 106. That logic is not frustrated in this case since the wife's request for alimony was denied by the district court.

We believe this matter should be heard because it involves intriguing, if not novel, questions of law, and conflicting policy considerations. Additionally, litigation in the district court is unlikely to resolve the controversy. Further, judicial resources will be conserved by hearing this case, since the same questions raised now would likely be raised on appeal following a final order in district court.

## III

*Validity of the Dominican Divorce*

A. Doris Mayer's Argument

To put Doris Mayer's first argument—that her Dominican divorce was valid—in perspective, we outline it in narrative form.

1. Although the full faith and credit clause of the United States Constitution, Article IV, Section 1, which requires North Carolina to recognize bilateral divorces of sister-states, has no application to foreign judgments, the criteria by which North Carolina grants comity to foreign divorce decrees should reasonably parallel the criteria North Carolina uses when it recog-

nizes divorces of sister-states. In that way, North Carolina can maintain a consistent divorce policy.

2. A valid judgment rendered in a foreign nation after a fair trial in a contested proceeding will be recognized in the United States. Restatement (Second) of Conflict of Laws § 98 (1971). Therefore, the bilateral divorce obtained by Doris Mayer should be recognized since it does not offend the public policy of North Carolina—that is, the grounds upon which the divorce was granted, irreconcilable differences, are substantially equivalent to those of a divorce granted under this State's no-fault divorce statute, N.C. Gen. Stat. § 50-6 (1976), which allows a divorce based on one year's separation of the parties.

3. Because there is neither evidence of partiality on the part of the Dominican court, nor fraud in the procurement of the Dominican divorce judgment, it would be a waste of time and a duplication of efforts for North Carolina's courts to go through the formalities of granting a divorce on the same grounds as did the Dominican court, for a marriage that, for all practical purposes, has already been terminated. North Carolina has no interest in perpetuating a status out of which no good can come and from which harm may result. Or, as stated by the New Jersey Supreme Court: "There remains little, if any, interest in encouraging the resurrection of deceased marriages, even if pronounced dead by other tribunals whose processes are not completely consistent with our own."[2] *Kazin v. Kazin,* 81 N.J. 85, 98, 405 A. 2d 360, 367 (1979).

4. North Carolina has recognized that there is a presumption of the validity of the second marriage which prevails over the presumption of the continuance of the first. *See Denson v. C. R.*

---

2. The Supreme Court of West Virginia has taken a similar view:

Divorce is the climax of domestic discord. . . . To compel two persons to live together under such circumstances would seem to do violence to the moral sensibilities of an enlightened age. If time evinces mistake to the errant parties; the law permits them to remarry; if not remarriage to each other, then perhaps a lost paradise regained through another marriage. Is not the interest of society generally best subserved by a dissolution of the marital status and the possibility of future respectability through remarriage rather than a pretended legal cohabitation . . .?

*Hatfield v. Hatfield,* 113 W.Va. 135, 141, 167 S.E. 89, 91-92 (1932).

*Fish Grading Co.*, 28 N.C. App. 129, 220 S.E. 2d 217 (1975), and *Parker v. Parker*, 46 N.C. App. 254, 265 S.E. 2d 237 (1980). That principle is served better by holding Victor Mayer to his obligations as a husband.

5. Finally, North Carolina's public policy is affected no more by a six-week bilateral Nevada divorce, which North Carolina must acknowledge under the full faith and credit clause, than a five-day foreign divorce. "Nevada gets no closer to the real public concern with the marriage than [the Dominican Republic]," since the establishment of a synthetic domicile in a sister state for the facile termination of a marriage is no less a subterfuge to circumvent North Carolina's interest in marriages. *Rosenstiel v. Rosenstiel*, 16 N.Y. 2d 64, 73, 262 N.Y.S. 2d 86, ---, 209 N.E. 2d 709, 712 (1965), *cert. denied* 384 U.S. 971, 16 L.Ed. 2d 682, 86 S.Ct. 1861 (1966). Consequently, a balanced social policy requires that comity be granted to the present divorce decree.

B. Analysis

Doris Mayer's argument, although masterfully elaborate and powerful, is based on a faulty premise, is contrary to the view held by a majority of the states in this country, and is at odds with an equally powerful and more persuasive public policy argument.

The full faith and credit clause has no application to foreign judgments. Recognition of foreign decrees by a State of the Union is governed by principles of comity. Consequently, based on notions of sovereignty, comity can be applied without regard to a foreign country's jurisdictional basis for entering a judgment. More often than not, however, "many of the American states are likely to refuse recognition [to deny comity] to a divorce decree of a foreign country not founded on" a sufficient jurisdictional basis. 1 R. Lee, *North Carolina Family Law* § 104, at 488 (4th ed. 1979). That is,

> [a] foreign divorce decree will be recognized, if at all, not by reason of any obligation to recognize it, but upon considerations of utility and mutual convenience of nations. Recognition may be withheld in various circumstances, as where the jurisdiction or public policy of the forum has been evaded in obtaining the divorce.

*Id.* at 487. Since the power of a State of the Union to grant a divorce decree is dependent upon the existence of a sufficient jurisdictional basis—domicile or such a relationship between the parties of the State as would make it reasonable for the State to dissolve the marriage—it follows that the validity of a foreign divorce decree should depend upon an adequate jurisdictional basis. *See* Restatement (Second) of Conflict of Laws § 72 (1971).

1. Jurisdiction

[1]  In this case the Dominican Republic had no interest in the marriage of the two North Carolinians, Doris Mayer and Fred Crumpler. Yet, on Doris Mayer's five-day sojourn to the Dominican Republic, the Dominican court purported to dissolve the marriage of two domiciliaries of North Carolina upon the grounds of "irreconcilable differences." Neither of the parties in this lawsuit had any connection with the Dominican Republic, save Doris Mayer's five-day stay there for the sole reason, by her own testimony, to obtain the divorce decree.

Further, Doris Mayer's characterization of the Dominican proceeding as "bilateral" rather than "ex parte" is not supported by the record. There is no evidence that Fred Crumpler appeared, through counsel or personally, in the Dominican proceeding. Doris Mayer did testify that Fred Crumpler signed some "papers" in connection with the Dominican proceeding, but the trial court did not find as a fact that Fred Crumpler made an actual or constructive appearance in the Dominican proceeding. Rather, the trial court found as a fact that "Mr. Crumpler indicated to plaintiff that he would seek a divorce under North Carolina law after he and plaintiff had been separated for one year." And, although a state must acknowledge the validity of a sister state's *bilateral* divorce under the full faith and credit clause, a state is permitted to inquire into the jurisdiction of a sister state in an *ex parte* divorce action. *Williams v. North Carolina*, 325 U.S. 226, 89 L.Ed. 1577, 65 S.Ct. 1092 (1945). *A fortiori*, North Carolina is allowed to inquire into jurisdictional prerequisites in Dominican proceedings.

Doris Mayer correctly cites *Denson* for the proposition that "the second marriage is presumed to be valid . . . [and] overcomes the presumption of the continuance of the first marriage," but that presumption is rebuttable. In this case, Victor Mayer successfully rebutted that presumption by showing that the *ex*

*parte* Dominican divorce was invalid on jurisdictional grounds and, as we shall show hereinafter, on policy grounds, too.

Even if the Dominican divorce could be found to be bilateral, Doris Mayer would still have on her shoulders the weight of the majority of American jurisdictions. The great weight of authority in this country is that divorces granted in foreign countries to persons who are domiciliaries of the United States are not valid and enforceable. *See* Annot., 13 A.L.R. 3d 1419 (1967).

2. Public Policy

In addition to the above, no constitutional provision or rule of comity requires North Carolina to accord legal force and effect to a divorce decree, like the one at issue here, that offends this State's public policy against the hasty dissolution of marriages. Until 15 July 1983, North Carolina permitted immediate dissolution of marriages only on proof of fault. *See* N.C. Gen. Stat. § 50-5 (1976) (repealed 1983). Acceding to a more enlightened view[3] that divorce should be allowed in some cases without proof of a cause or motivation of the divorce petition, North Carolina, beginning in 1965, also allowed divorces upon proof that the parties had lived separate and apart for one year or more. N.C. Gen. Stat. § 50-6 (Supp. 1983). Efforts to change the one-year period to six months have failed, and that failure is consistent with North Carolina's public policy that a longer waiting period is necessary to protect the institution of marriage from hasty judgments and casual disruptions since differences may in time be reconciled.

We also reject Doris Mayer's argument that "irreconcilable differences" as a ground for divorce under the Dominican law is substantially equivalent to the ground providing for absolute

---

3. Traditionally, divorce was viewed as "a remedy provided exclusively for an innocent person whose spouse [had] been guilty of a serious marital wrong. Divorce itself [was] looked upon as evil, to be tolerated only in circumstances which strictly [met] the statutory standard. . . ." Clark, *Estoppel Against Jurisdictional Attack on Decrees of Divorce*, 70 Yale L. J. 45, 53-54 (1960). When divorce statutes were not complied with strictly, states invalidated resulting divorces, both to preserve the institution of marriage and to warn "other erring spouses who might be tempted to evade the legal requirements.

More modern authorities look upon divorce as a regrettable but necessary legal recognition of marital failure . . . [because] the factors leading to breakdown of the marriage are not all on one side." *Id.* at 54.

divorce after one year's separation. As Victor Mayer argued in his brief:

> The appellant sought a Dominican divorce precisely because the law of North Carolina governing divorce is not and was not 'substantially equivalent' to the law of the Dominican Republic. The appellant sought a Dominican divorce because North Carolina law did not permit her to obtain a hasty divorce from her husband in the winter of 1981. It was to avoid the force and effect of the one-year waiting period imposed by North Carolina law that the appellant travelled to the Caribbean and obtained a divorce there.

We cannot sanction a procedure by which citizens of this State with sufficient funds to finance a trip to the Caribbean can avoid our legislature's judgment on the question of divorce. To hold otherwise would be to flout our law; it would permit domiciliaries of North Carolina to submit their marital rights and obligations to the contrary policies and judgments of a foreign nation with which they have no connection.

Considering the circumstances of this case, the applicable law, and the important policy considerations, the trial court properly refused to accord legal force and effect to the Dominican divorce decree.

C. Summary

For the benefit of the bar we have addressed, perhaps in exhaustively detailed fashion, many of the jurisdictional and public policy reasons bearing on—and indeed, the convoluted rationale supporting and opposing—foreign migratory divorces. Much of what we have said impels us to reject Doris Mayer's argument that her Dominican divorce was valid. Our narrow holding, however, must be emphasized—considering the circumstances of this case, Victor Mayer can neither assert the invalidity of Doris Mayer's Dominican divorce nor the invalidity of his subsequent marriage to Doris Mayer.

IV

*Estoppel*

[2] Doris Mayer next contends that even if we find the Dominican divorce invalid (as we have done in Part III, *supra*),

Victor Mayer should, nevertheless, be estopped from questioning its validity since (a) he participated in her procurement of the invalid divorce; (b) all parties relied upon the divorce's validity until Victor Mayer abandoned Doris Mayer; and (c) a contrary result would create a marriage at will by Victor Mayer, who could end the marital relationship at any time he desired, and yet prevent Doris Mayer from avoiding the obligations of her remarriage. Consequently, Doris Mayer argues that she should receive alimony *pendente lite* and reasonable attorney's fees.

In a forceful response, Victor Mayer argues that *he is not* estopped to assert the invalidity of the Dominican divorce decree, and that *Doris Mayer is* estopped to assert the validity of her marriage to him. Victor Mayer first cites N.C. Gen. Stat. § 51-3 (Supp. 1983), which states that "all marriages . . . between persons either of whom has a husband or wife living at the time of such marriage . . . shall be void." Victor Mayer then argues that even if equity could suspend the operation of G.S. § 51-3, the equities in this case weigh no more heavily for Doris Mayer than for him since (a) she and he are *in pari delicto*; (b) Doris Mayer knew or should have known that the Dominican divorce decree might not be recognized in North Carolina; (c) no substantial equitable rights matured in consequence of the aborted union—no children were born of the union, and no third parties would be affected by nullification of the marriage—and (d) Doris Mayer seeks relief from the legal consequences of her own injudicious haste. Finally, Victor Mayer argues that he was not a party to the Dominican decree and that principles of *res judicata* and estoppel, therefore, do not apply to him.

The question, squarely presented by these contentions, is whether a husband, who actively participates in his wife's procurement of an invalid divorce from her prior husband, is estopped from denying the validity of that divorce. After a careful balancing of legal and policy considerations, we answer that question "yes."

We are persuaded by Doris Mayer's argument, but we could have more quickly and more easily embraced her position had there been a child of her marriage with Victor Mayer; or had the marriage been of long duration. Indeed, we have not lightly dismissed Victor Mayer's implicit argument that Doris Mayer,

with full knowledge of the consequences, gambled and lost—she left her lawyer-husband, releasing him from all alimony obligations, for a greater love, or for what she erroneously thought was a better deal. Notwithstanding the strong legal, factual and policy considerations the above factors engender, and in spite of the criticism that the application of a quasi-estoppel doctrine circumvents a state's divorce law, it would be even more inimical to our law and to our public policy, to permit Victor Mayer to avoid his marital obligations by acting inconsistently with his prior conduct.

Under quasi-estoppel doctrine, one is not permitted to injure another by taking a position inconsistent with prior conduct, regardless of whether the person had actually relied upon that conduct. *See generally* Clark, *Estoppel Against Jurisdictional Attack on Decrees of Divorce*, 70 Yale L. J. 45 (1960); Weiss, *A Flight on the Fantasy of Estoppel in Foreign Divorces*, 50 Colum. L. Rev. 409 (1950); *see also Kazin v. Kazin*, 81 N.J. 85, 405 A. 2d 360 (1979); *Harlan v. Harlan*, 70 Cal. App. 2d Supp. 657, 161 P. 2d 490 (1945).

The development of a quasi-estoppel doctrine is reflected in the Restatement (Second) Conflict of Laws § 74 (1971), which states that "[a] person may be precluded from attacking the validity of a foreign decree if, under the circumstances, it would be inequitable for him to do so." *Id.* at 224. The scope of § 74 is defined in Comment b:

> [It is] not limited to situations of . . . 'true estoppel' where one party induces another to rely to his damage upon certain representations. The rule may be applied whenever, under all the circumstances, it would be inequitable to permit a particular person to challenge the validity of a divorce decree. Such inequity may exist when action has been taken in reliance on the divorce or expectations are based on it or when the attack on the divorce is inconsistent with the earlier conduct of the attacking party.

*Id.*[4]

---

4. The successive changes in the American Law Institute's position on this issue are evident when we compare the 1934 and 1948 versions of § 74 to the present version: The 1934 version provided that "[t]he validity of a divorce decree can-

According to Professor Clark, when analyzing quasi-estoppel cases, "[t]hree factors seem to be involved: (1) the attack on the divorce is inconsistent with prior conduct of the attacking party; (2) the party upholding the divorce has relied upon it, or has formed expectations based on it; (3) these relations or expectations will be upset if the divorce is held invalid." *Clark, supra* p. 13, at 56-57. Significantly, all three factors do not have to be present for estoppel to apply. When all three factors are present, however, the application of the estoppel doctrine is especially compelling.

North Carolina courts have recognized the doctrine of equitable estoppel in *Redfern v. Redfern,* 49 N.C. App. 94, 270 S.E. 2d 606 (1980), and *McIntyre v. McIntyre,* 211 N.C. 698, 191 S.E. 507 (1937). In *Redfern,* the defendant attempted to avoid paying alimony to his second wife by claiming that *he* had not been lawfully divorced from his first wife because the divorce judgment was not actually signed until after the second marriage. The husband contended that the second marriage was void under G.S. § 51-3, but our court, although holding that the question presented was a question of law, not ethics, nevertheless stated that the defendant should be "equitably estopped" from asserting the invalidity of his divorce since he had been guilty of culpable negligence in failing to obtain a signed divorce judgment before entering into the second marriage. *Redfern,* 49 N.C. App. at 97, 270 S.E. 2d at 608.

In *McIntyre,* a husband, with the knowledge of his future second wife, dissolved his marriage with his first wife in an invalid Nevada proceeding. In the second wife's action for alimony, the husband was held to be estopped from questioning the validity of the Nevada divorce that *he* obtained. The *McIntyre* Court said that it would not "be in accord with reason and justice . . . [to allow the husband] to question [the Nevada court's] jurisdiction,

---

not be questioned . . . either by a spouse who has obtained such decree or divorce from a court which had no jurisdiction, or by a spouse who takes advantage of such decree by remarrying." Restatement of Conflict of Laws § 112 (1934). The Comment to the 1948 version states that "[a]ny person may be precluded from questioning the validity of a divorce decree if, under all the circumstances, his conduct has led to the obtaining of the divorce decree, or for any other reason has been such as to make it inequitable to permit him to deny the validity of the divorce decree." Restatement of Conflict of Laws § 112, Comment c, at 110 (Supp. 1948).

when new rights and interests have arisen as a result of his second marriage." 211 N.C. at 699, 191 S.E. at 507.

That both *Redfern* and *McIntyre* are factually distinguishable from this case does not mean that the language used therein is of no value to us. Indeed, these cases show that estoppel principles depend upon the facts of each case.

In addition to the position taken in the Restatement (Second) Conflict of Laws § 74 and this Court's language in *Redfern* and *McIntyre*, there is considerable authority from other jurisdictions that a husband, who encouraged his wife to obtain a divorce from her prior spouse, is estopped from questioning its validity. Professor Clark, as though presciently writing for the case *sub judice*, sets forth the problem this way:

> This problem most commonly arises when a man persuades a married woman to divorce her husband so that she will be free to marry him. He may even finance the divorce, provide a lawyer, or take an active part in other ways. When he does so, or even when he merely marries her with full knowledge of the circumstances surrounding the divorce, he is estopped to question the validity of the divorce. He has engaged in conduct calculated to induce reliance on the divorce, and indeed, he has relied on it himself. Therefore, the reasons of policy which prevent attack by a party to the divorce action are equally persuasive here.

*Clark, supra* p. 13, at 66-67. Professor Weiss reaches a similar conclusion:

> [W]here W [the wife] and H-1 [the first husband] are both estopped from attacking the foreign divorce, regardless of the basis of such estoppel, to allow H-2 [the second husband] to attack that divorce at will is to place the matrimonial status of the first spouses in uncertainty and to subject them to the mercy of H-2 who, at his own convenience, is gratuitously allowed the bonanza of playing fast and loose when he feels 'the sweet has turned bitter.' H-2 chose to marry and, in the absence of strong considerations to the contrary after taking into account the circumstances of all the spouses affected, he should be held to his election, particular-

ly if he was aware of the facts when he made that choice—
and even more so if he played a part in inducing the divorce.

*Weiss, supra* p. 13, at 425. The conclusion reached by *Clark* and
*Weiss* is no different from that reached by several other state
courts that have considered the issue. *See Kazin v. Kazin; In Re
Marriage of Winegard,* 278 N.W. 2d 505 (Iowa), *cert. denied,* 444
U.S. 951, 62 L.Ed. 2d 321, 100 S.Ct. 425 (1979); *Poor v. Poor,* 381
Mass. 392, 409 N.E. 2d 758 (1980); *Rosen v. Sitner,* 274 Pa. Super.
445, 418 A. 2d 490 (1980); *Campbell v. Campbell,* 164 Misc. 647, 1
NYS 2d 619 (1937); *Zirkalos v. Zirkalos,* 326 Mich. 420, 40 N.W. 2d
313 (1949); *Goodloe v. Hawk,* 113 F. 2d 753 (D.C. Cir. 1940);
*Leatherbury v. Leatherbury,* 233 Md. 344, 196 A. 2d 883 (1964);
*Harlan v. Harlan; Mussey v. Mussey,* 251 Ala. 439, 37 So. 2d 921
(1948).

As much as in any area of the law, quasi estoppel cases turn
on the particular facts of each case. The facts in this case compel
the conclusion we reach. The record suggests that Victor Mayer
insisted on Doris Mayer's obtaining a Dominican divorce; that he
promised to support her in a manner better than the one she had
been accustomed to, prompting Doris Mayer to sign away any
alimony she may have been entitled to from Mr. Crumpler; and
that he accompanied her on her trip to the Dominican Republic,
paying for her transportation and lodging, and other personal ex-
penses. After the divorce, Victor Mayer continued to uphold its
validity as he had Doris Mayer sign a prenuptial agreement and
then married her. While they were married, Victor Mayer lived in
Doris Mayer's house and borrowed money from her, including
$25,000 which he admits he has not repaid. Victor Mayer never
questioned the validity of the marriage until he abandoned Doris
Mayer. In addition, Doris Mayer relied on the divorce's validity.

Failure to estop Victor Mayer in this case would result in
matrimonial uncertainty because, as stated earlier, it "creates the
impossible situation of [a] wife or [a] husband 'at will' where the
divorced party who remarried cannot avoid the obligation of his
remarriage, while the second spouse could at any time [get] an an-
nulment." Note, *Enforcement by Estoppel of Divorces Without
Domicil: Toward A Uniform Divorce Recognition Act,* 61 Harvard
L. Rev. 326, 333 (1948).

We are not unmindful of Victor Mayer's argument that to estop him from questioning the divorce's validity would have, as he puts it, the effect of validating a marriage which G.S. § 51-3 declares a nullity. There is a difference, however, between declaring a marriage valid and preventing one from asserting its invalidity. The theory behind the equitable estoppel doctrine is not to make legally valid a void divorce or to make an invalid marriage valid, but rather, to prevent one from disrupting family relations by allowing one to avoid obligations as a spouse. Stated differently, equitable estoppel is dependent upon events which led to the divorce or which may have occurred after the divorce. It is a personal disability of the party attacking the divorce judgment; it is not a function of the divorce decree itself. *See Clark, supra* p. 13, at 47 and *Swisher, supra* p. 2, at 38-39.

Further, this Court has already recognized that a *party* to an invalid divorce is estopped and that one marrying in reliance on such a divorce is entitled to the benefits of the marriage. *McIntyre*. It, therefore, would be anomalous to argue that estopping a second husband, who participated in his wife's procurement of a divorce, would have any greater impact on this State's public policy than estopping one who is a party to the marriage.

We hold that Victor Mayer is estopped from asserting as a defense the invalidity of Doris Mayer's divorce, and that Doris Mayer is entitled, based on the trial court's findings, to alimony *pendente lite* and reasonable attorney's fees. The question of the validity of the prenuptial agreement limiting Doris Mayer's alimony to $1,000 per month is not before this Court.

For the above reasons, this matter is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

Judges WELLS and EAGLES concur.