IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-130

No. COA21-41

Filed 1 March 2022

Brunswick County, No. 19 CVS 954

SNOW ENTERPRISE, LLC, a North Carolina Limited Liability Company, MICKEY DALE SNOW, and RUSSELL M. SNOW, Plaintiffs,

v.

BANKERS INSURANCE COMPANY, a Florida Corporation, Defendant.

Appeal by Plaintiffs from orders entered on 17 August 2020 and 16 September 2020 by Judge Jason C. Disbrow in Brunswick County Superior Court. Heard in the Court of Appeals 20 October 2021.

> *Fox Rothschild LLP, by Robert H. Edmunds, Jr., Kip D. Nelson, and Elizabeth Brooks Scherer, and Law Offices of G. Grady Richardson, Jr., P.C., by G. Grady Richardson, Jr., and Jennifer L. Carpenter, for the Plaintiff-Appellants.*

> *Jordan Price Wall Gray Jones & Carlton, PLLC, by Lori P. Jones, for the Defendant-Appellee.*

JACKSON, Judge.

Snow Enterprises, LLC, Mickey Dale Snow, and Russell M. Snow (collectively, "Plaintiffs")[1] appeal the trial court's orders disqualifying Plaintiffs' expert and striking the expert's affidavit, denying Plaintiffs' motion to strike an affidavit by a

---

[1] Plaintiff Russell M. Snow is Mickey Snow's son, and Snow Enterprises, LLC, is a family company.

former employee of Bankers Insurance Company ("Defendant"), granting summary judgment in favor of Defendant, and denying Plaintiffs' motion for reconsideration. We affirm the orders of the trial court.

## I. Background

In March 2015, Mickey Snow and his wife, a native of Thailand, made arrangements to travel to Bangkok, Thailand. They originally planned to depart on 26 October 2015 and return on 11 November 2015. Mr. Snow lives in Eden, North Carolina, and owns a second home in Ormond Beach, Florida. He planned to depart from Daytona, Florida, near his home in Ormond Beach, and make a connection in Atlanta, Georgia, before flying to Bangkok.

Mr. Snow subsequently learned that he had become the subject of a criminal investigation involving the sexual exploitation and abuse of an underaged girl. On Thursday, 10 September 2015, Thomas Woodall, another individual implicated in the investigation, was arrested and charged with various sex crimes.

The next day, Friday, 11 September 2015, Mr. Snow changed his travel plans. At an approximate cost of $2,600 per ticket, he caused his reservations to be changed to a direct flight from Atlanta to Bangkok departing Monday, 14 September 2015 and returning Wednesday, 30 September 2015. Then he drove to Atlanta with his wife and they flew to Thailand on Monday, 14 September 2015.

On 5 October 2015, Mr. Snow was indicted by a Rockingham County grand

jury with the Class D felony of patronizing a prostitute with a severe or profound mental disability. *See* N.C. Gen. Stat. § 14-205.2(d) (2021). He was subsequently indicted with six counts of statutory rape/sexual offense of a 13-, 14-, or 15-year-old by a defendant more than six years older than the victim, 10 counts of patronizing a prostitute, four counts of second-degree forcible sexual offense, and six counts of promoting the prostitution of a minor.

¶ 6        At the time, Mr. Snow was still abroad. After he was indicted, he left Bangkok for Costa Rica by way of Holland and Panama. At some point, he was detained by authorities in Panama and forced to return to Holland, where he was then forced to return to Bangkok. His return ticket was changed from 30 September 2015 to 1 November 2015, but it was never used.

¶ 7        On or about 24 November 2015, Mr. Snow was arrested in Thailand and turned over by Thai officials to United States law enforcement. He was then returned to the United States and incarcerated in the Rockingham County Jail. At his first appearance before a Rockingham County magistrate, his bond was set at $25 million.

¶ 8        On 16 December 2015, Defendant posted bond on Mr. Snow's behalf in exchange for a $1 million bond premium and Mr. Snow was released from jail. As a condition of his release, Mr. Snow was required to submit to electronic house arrest, including GPS monitoring. As collateral for the bond, Plaintiffs provided Defendant with $20 million in cash and pledged real estate worth at least $5 million.

¶ 9        The day after his release from jail, Mr. Snow executed a Bail Bond Application and Agreement. The terms and conditions of the Bail Bond Application and Agreement state, amongst other things, that "[t]he [bond] premium is fully earned upon your release from custody[,]" and that

> the Surety shall have the right to immediately apprehend, arrest, and surrender you, and you shall have no right to any refund of premium whatsoever . . . [if] you commit any act that constitutes reasonable evidence of your intention to cause a forfeiture of the Bond . . . [or] you are arrested and incarcerated for any other offense (other than a minor traffic offense)[.]

¶ 10        For the next year and a half, Mr. Snow was free on bail, subject to the conditions of his electronic house arrest, including GPS monitoring.

¶ 11        On 28 August 2017, Mr. Snow moved the trial court to reduce the amount of his bond. The court allowed the motion, reducing the bond to $15 million in an 8 September 2017 order. The court ordered Mr. Snow to continue to submit to electronic house arrest and electronic monitoring, but allowed him to travel outside the county to meet with his attorney, and outside the state for medical treatment, provided he first notify the District Attorney's office and obtain approval and wear an electronic monitor during any travel for medical treatment. Finally, the court ordered that if Mr. Snow violated the 8 September 2017 order setting the conditions of his pre-trial release, he "be immediately arrested and held in custody without bond until such time as the Court can set any new conditions of pre-trial release under N.C.G.S.

§ 15A-534(f)." Defendant thereafter released Plaintiffs' real property collateral and $5 million of the cash collateral.

¶ 12 On 15 September 2017, Mr. Snow moved for the trial court to allow him to travel to Jacksonville, Florida, for medical appointments on 20 and 21 September 2017 at the Mayo Clinic. He requested that the court allow him to drive and break up the drive into two days, allowing him an additional day to recuperate after each leg of the trip. He also requested that he be allowed to make the trip without electronic monitoring. Initially, the State objected, arguing that it had not received the notice required by the 8 September 2017 order, that the three days before and after the medical appointments were excessive, and that relieving Mr. Snow of his obligation to wear an electronic monitor was improper. The State subsequently withdrew its objection, provided Mr. Snow submitted to electronic monitoring the entire time, as required by the 8 September 2017 order. The court granted Mr. Snow's request in part, allowing him to travel to Florida for the appointments, but refusing to relieve him of electronic monitoring.

¶ 13 During the trip to Florida, the Rockingham County Sheriff's Office lost track of Mr. Snow. The battery in his electronic monitor died and remained dead for two hours after his medical appointment in Jacksonville on 21 September 2017. Mr. Snow's last known location before the battery died was an Outback Steakhouse, where he arrived at 7:16 p.m. The next location tracked by the monitor was Mr.

Snow's home in Ormond Beach, where he returned and connected the monitor's battery to its charger at 9:09 p.m.

¶ 14 On 25 September 2017, a magistrate issued an order for arrest for Mr. Snow for alleged violations of the conditions of his pre-trial release. Mr. Snow was arrested by a deputy from the Rockingham County Sheriff's Office, and at his first appearance in Rockingham County District Court for the arrest the following day, the district court ordered that Mr. Snow be held without bond until a hearing in superior court before Judge Nathaniel Poovey, the judge who had granted Mr. Snow's request to leave the state for medical treatment.[2]

¶ 15 On 29 September 2017, Defendant caused a Surrender of Defendant by Surety form ("Surrender Form") to be filed in Rockingham County Superior Court through its local bail agent. The form stated that it was for a "pre-breach surrender" and that the surrender was being made "before a breach of the bond" and "before there has been a breach of the bond obligation." Defendant thereby requested "exoneration from the bond obligation[.]"

¶ 16 On 2 October 2017, the State moved for the trial court to revoke the conditions of Mr. Snow's pre-trial release. The State's motion came on for hearing in Rockingham County Superior Court before the Honorable Nathaniel Poovey on 4

---

[2] Mr. Snow's first appearance occurred in district court because the only superior court judge available at the time recused himself.

October 2017. Judge Poovey denied the State's motion, finding that Mr. Snow did not violate the conditions of his pre-trial release during the Florida trip. The court therefore ordered that Mr. Snow be released from jail with the same bond and under the same conditions as in the 8 September 2017 order.

¶ 17 The next day, on 5 October 2017, Defendant posted a re-written $15 million bond and Mr. Snow was released. Mr. Snow was not charged an additional bond premium for the re-written bond. While he was free on bond for the next nine months, Mr. Snow never requested a return of his bond premium or a return of his collateral.

¶ 18 On 19 July 2018, Mr. Snow pleaded guilty to a single count of the Class F felony of aiding and abetting the prostitution of a minor, and the State dismissed all the other charges against him. Mr. Snow's defense counsel informed Defendant that the criminal matters had been resolved, and Defendant released the remaining $15 million in collateral.

¶ 19 A little over a month later, in a 28 August 2018 letter, Mr. Snow for the first time took the position that Defendant was required to return the $15 million in collateral within 72 hours of the filing the Surrender Form on 29 September 2017 and that he was entitled to a refund of the $1 million bond premium because the Surrender Form stated that Defendant's surrender on the original bond was a pre-breach surrender and Judge Poovey ruled on 4 October 2017 that Mr. Snow had not violated the terms of his pre-trial release. In other words, just over a month after his

criminal charges were resolved—almost a year after the Surrender Form was filed—and after being free on bail for nearly three years while the criminal charges against him were pending (with the exception of 11 days he spent in jail after his 2017 Florida trip), Mr. Snow argued that Defendant was required to return him $16 million approximately a year earlier. Receiving no response, Mr. Snow sent a second letter on 7 January 2019, threatening legal action.

¶ 20 Defendant disputed both of Mr. Snow's positions in a 15 January 2019 reply, explaining that it posted a new bond without charging Mr. Snow any additional premium after learning he was eligible for bail again after the 4 October 2017 hearing, that it did so after consulting with his attorneys, and that the $1 million premium on the original bond was earned in full upon the posting of that bond, consistent with the provision of the 17 December 2015 Bail Bond Application and Agreement regarding "[t]he [bond] premium [being] fully earned upon [his] release from custody."

¶ 21 On 6 May 2019, Plaintiffs initiated this action in Brunswick County Superior Court. In their verified complaint, Plaintiffs asserted six causes of action, requesting a declaratory judgment, return of the $1 million bond premium, disgorgement of any investment income earned by Defendant with the $16 million allegedly wrongfully retained after the 29 September 2017 filing of the Surrender Form, attorney's fees, pre-judgment interest, treble damages under the Unfair and Deceptive Practices Act,

and punitive damages. On 8 July 2019, Defendant moved to dismiss the complaint, and alternatively, answered, asserting affirmative defenses, including waiver, estoppel, and unjust enrichment.

¶ 22    On 27 July 2020, Plaintiffs moved for summary judgment. On 31 July 2020, Defendant moved for summary judgment. On 31 July 2020, Defendant also moved to disqualify an expert identified by Plaintiffs in their expert disclosures and strike an affidavit filed by the expert on 27 July 2020. On 10 August 2020, Plaintiffs filed a motion to strike an affidavit by a former employee of Defendant filed in support of Defendant's motion for summary judgment on 31 July 2020.

¶ 23    These motions came on for hearing before the Honorable Jason C. Disbrow in Brunswick County Superior Court on 10 August 2020. In an order entered 17 August 2020, the trial court granted Defendant's motion to disqualify and strike the affidavit of Plaintiffs' expert, denied Plaintiffs' motion to strike,[3] and entered summary judgment in favor of Defendant.

¶ 24    On 27 August 2020, Plaintiffs moved for the court to reconsider its 17 August 2020 order pursuant to Rules 58, 59, and 60 of the North Carolina Rules of Civil

---

[3] Plaintiffs offer no argument in their brief regarding the trial court's denial of their motion to strike. Any error in the denial of this motion is therefore deemed abandoned. *See* N.C. R. App. P. 28(a) ("Issues not presented and discussed in a party's brief are deemed abandoned.").

Procedure and various common law doctrines, which the trial court denied in an order entered on 16 September 2020.[4]  That same day, Plaintiffs entered timely written notice of appeal from both the trial court's 17 August 2020 order awarding summary judgment to Defendant and the 16 September 2020 order denying the motion for reconsideration.

## II.    Analysis

This appeal presents a question of first impression.  Because it arises in a novel context, we begin with an introduction of the relevant statutory framework.  Then we turn to resolution of this question, as well as the other issue raised by the appeal.

### A. Introduction

A criminal defendant "charged with a noncapital offense must have conditions of pretrial release determined" by a judge.  N.C. Gen. Stat. § 15A-533(b) (2021).  One condition available to the judge is the execution of an appearance bond secured by a cash deposit.  *Id.* § 15A-534(a)(4).  The security for such appearance, called "bail," is to ensure the defendant's appearance in court.  *See id.* § 58-71-1(2) (defining a "[b]ail bond" as "[a]n undertaking by the principal to appear in court as required upon penalty of forfeiting bail to the State in a stated amount").  If the defendant fails to

---

[4] Plaintiffs also offer no argument in their brief regarding the trial court's denial of their motion for reconsideration.  Accordingly, any error in the denial of this motion is deemed abandoned.  *See* N.C. R. App. P. 28(a).

appear for a court hearing, the bond amount is forfeited. *Id.* § 15A-544.3(a).

A defendant compensates a bail bondsman or bond surety for the risk that the defendant will not appear, or otherwise violate the conditions of the defendant's bond, through payment of a bond premium. *See id.* § 58-71-1(6a) (defining "premium" as "[a]n amount of money paid in exchange for a bail bondsman's services in writing a bail bond"). In general, a bond premium is not returnable once "an agreement has been entered into between a defendant and a surety," even if the amount of the bond is later reduced. *Id.* § 58-71-16. However,

> [a]t any time before there has been a breach of the undertaking in any type of bail or fine and cash bond the surety may surrender the defendant to the sheriff of the county in which the defendant is bonded to appear or to the sheriff where the defendant was bonded; in such case the full premium shall be returned within 72 hours after the surrender.

*Id.* § 58-71-20. Interpreting this provision, our Supreme Court has observed that under this statute, if a bondsman "rescind[s] the bail contract and surrender[s] [the] defendant . . . *without cause or reason*[,]" he becomes liable in contract for the amount of the premium that is not returned to the defendant. *Shore v. Farmer*, 351 N.C. 166, 171, 522 S.E.2d 73, 76 (1999) (emphasis added).

North Carolina General Statute § 58-71-20 goes on to provide, however, that a "defendant may be surrendered without the return of [the] premium for the bond if the defendant . . . [v]iolates any order of the court." N.C. Gen. Stat. § 58-71-20(5)

(2021). Whether a bond premium must be returned within 72 hours of a surrender thus depends, as a general proposition, on whether the surrender occurs because of a breach of a condition of the bond. *See id.* Section 58-71-20 thus makes the necessity of the return of a bond premium within the statutorily mandated 72 hours dependent on a determination—whether a suspected breach constitutes a breach—that may not occur, and in this case did not occur, within 72 hours of the surrender.

¶ 29 If the surrender is not because of a breach of a condition of the bond, it is considered a pre-breach surrender. *See id.* § 15A-540(a) ("Before there has been a breach of the conditions of a bail bond, the surety may surrender the defendant[.]"). If the surrender *is* because of a breach of a condition of the bond, on the other hand, it is considered a post-breach surrender. *See id.* § 15A-540(b) ("After there has been a breach of the conditions of a bail bond, . . . [a] surety may arrest the defendant . . . [or] may surrender a defendant who is already in the custody of any sheriff[.]").

¶ 30 When a defendant is surrendered because of a suspected breach, "the sheriff shall without unnecessary delay take the defendant before a judicial official, along with a copy of the undertaking received from the surety and a copy of the receipt provided to the surety." *Id.* § 15A-540(c). "The judicial official shall then determine whether the defendant is again entitled to release and, if so, upon what conditions." *Id.*

¶ 31 This case presents the question of whether a bail bond surety can avoid liability

for failure to return a bond premium to a defendant within the 72 hours prescribed by § 58-71-20 where the defendant is surrendered by the surety because of an alleged breach of the conditions of the defendant's pre-trial release (which, by virtue of the bail contract with the surety, would be a breach of a condition of the bond) but the trial court subsequently determines that the suspected breach, did not, in fact, constitute a breach after all. That is, if a surety rescinds its bail contract with a defendant because of a good faith mistake about whether there has been a breach and, after learning of the mistake, re-writes the bond and gives the defendant the benefit of his bargain by waiving any additional premium, returning the surety and defendant to the status quo before the alleged breach, can the surety escape liability under § 58-71-20 for failing to return the bond premium within 72 hours of the surrender? We hold that it can. If the surety returns both itself and the defendant to the same position each occupied before the suspected breach, and the defendant is released from custody and does not raise any objection or request a return of the bond premium before he is released, we hold that the defendant is estopped from later seeking recovery of the bond premium.

## B. Standard of Review

¶ 32     Summary judgment is only proper if

> there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. In order to prevail on a summary judgment motion, the moving

> party must show either (1) an essential element of plaintiff's claim is nonexistent; (2) plaintiff cannot produce evidence to support an essential element of his claim, or (3) plaintiff cannot surmount an affirmative defense which would bar the claim. The trial court must construe all evidence in the light most favorable to the non-moving party, allowing the non-moving party to be given all favorable inferences as to the facts.

*Gibson v. Mutual Life Ins. Co. of New York*, 121 N.C. App. 284, 286, 465 S.E.2d 56, 58 (1996) (cleaned up).

¶ 33    On appeal,

> [w]e review a trial court order granting or denying a summary judgment motion on a *de novo* basis, with our examination of the trial court's order focused on determining whether there is a genuine issue of material fact and whether either party is entitled to judgment as a matter of law. As part of that process, we view the evidence in the light most favorable to the nonmoving party.

*Beeson v. Palombo*, 220 N.C. App. 274, 277, 727 S.E.2d 343, 346-47 (2012) (citation omitted).

¶ 34    Furthermore, "[i]f the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal." *Shore v. Brown*, 324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989). "If the correct result has been reached, the judgment will not be disturbed even though the trial court may not have assigned the correct reason for the judgment entered." *Id.*

**C. Defendant's Liability for Failure to Return the Bond Premium**

¶ 35    Plaintiffs are estopped from seeking recovery of the bond premium for the original bond because Mr. Snow received the benefit of the re-written bond and Plaintiffs failed to notify Defendant that Mr. Snow did not wish to receive this benefit within a reasonable amount of time. This holding is based on three related equitable doctrines: (1) estoppel; (2) election; and (3) unjust enrichment.

### 1. *Estoppel*

¶ 36    "Broadly speaking, estoppel is a bar which precludes a person from denying or asserting anything to the contrary of that which has, in contemplation of law, been established as the truth." *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 13, 591 S.E.2d 870, 879 (2004) (internal marks and citation omitted). It is "a means of preventing a party from asserting a legal claim or defense which is contrary to or inconsistent with his prior actions or conduct." *Godley v. Pitt Cnty.*, 306 N.C. 357, 360, 293 S.E.2d 167, 169 (1982). "Where a party engages in positive acts that amount to ratification resulting in prejudice to an innocent party, the circumstances may give rise to estoppel." *Chance v. Henderson*, 134 N.C. App. 657, 664, 518 S.E.2d 780, 784 (1999) (citation omitted). Likewise, "unreasonable delay after notice[] resulting in prejudice to innocent parties . . . [can] work an estoppel." *Howard v. Boyce*, 254 N.C. 255, 266, 118 S.E.2d 897, 905 (1961). "[W]hen only one inference can reasonably be drawn from the undisputed facts, estoppel becomes a question of law, properly decided by this Court." *Tarlton v. Stidham*, 122 N.C. App. 77, 82, 469 S.E.2d 38, 42

(1996) (citation omitted).

¶ 37        "While estoppel in its broadest sense predates the American colonial experience, . . . North Carolina courts have [] long recognized the doctrine of equitable estoppel, otherwise known as estoppel *in pais.*"  *Whitacre P'ship*, 358 N.C. at 13-16, 591 S.E.2d at 879-81.  In general, equitable estoppel applies

> when anyone, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

*State Highway Comm'n v. Thornton*, 271 N.C. 227, 240, 156 S.E.2d 248, 258 (1967) (cleaned up).  Our Supreme Court has described equitable estoppel as "an application of the golden rule to the everyday affairs of men."  *McNeely v. Walters*, 211 N.C. 112, 113, 189 S.E. 114, 115 (1937).

¶ 38        "North Carolina has also adopted the doctrine of quasi-estoppel."  *Z.A. Sneeden's Sons, Inc. v. ZP No. 116*, 190 N.C. App. 90, 96, 660 S.E.2d 204, 208 (2008). "Under quasi-estoppel doctrine, one is not permitted to injure another by taking a position inconsistent with prior conduct, regardless of whether the person had actually relied upon that conduct."  *Mayer v. Mayer*, 66 N.C. App. 522, 532, 311 S.E.2d 659, 666 (1984).  Likewise, "[u]nder a quasi-estoppel theory, a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take

a later position inconsistent with the prior acceptance of that same transaction or instrument." *Whitacre P'ship*, 358 N.C. at 18, 591 S.E.2d at 881-82. "[T]he essential purpose of quasi-estoppel . . . is to prevent a party from benefitting by taking two clearly inconsistent positions." *B & F Slosman v. Sonopress, Inc.*, 148 N.C. App. 81, 88, 557 S.E.2d 176, 181 (2001).

¶ 39        "The key distinction between quasi-estoppel and equitable estoppel is that the former may operate without detrimental reliance on the part of the party invoking the estoppel[,]" *Whitacre P'ship*, 358 N.C. at 18, 591 S.E.2d at 882, whereas "[u]nder 'true' estoppel, one party induces another to rely to his damage upon certain representations[,]" *Chance*, 134 N.C. App. at 665, 518 S.E.2d at 785. Quasi-estoppel is thus "directly grounded [] upon a party's acquiescence or acceptance of payment or benefits, by virtue of which that party is thereafter prevented from maintaining a position inconsistent with those acts." *Godley*, 306 N.C. at 361, 293 S.E.2d at 170. "[T]he acceptance of benefits precludes a subsequent inconsistent position, even where acceptance is involuntary, arises by necessity, or where . . . a party voluntarily accepts a benefit in order to avoid the risk of harm." *Shell Island Homeowners Ass'n, Inc. v. Tomlinson*, 134 N.C. App. 217, 226, 517 S.E.2d 406, 413 (1999). While quasi-estoppel "is similar to equitable estoppel in that it may not be invoked by a stranger to the transaction where the prior position was asserted[,]" *Whitacre P'ship*, 358 N.C. at 19, 591 S.E.2d at 882, unlike equitable estoppel more generally, it is "inherently

flexible and cannot be reduced to any rigid formulation[,]" *id.* at 18, 591 S.E.2d at 882.

### 2. *Election*

¶ 40 "North Carolina courts have long recognized and applied the election of remedies doctrine." *Id.* at 19, 591 S.E.2d at 882.

> The doctrine is founded on the principle that where by law or by contract there is a choice of two remedies which proceed upon opposite and irreconcilable claims of right, the one taken must exclude and bar the prosecution of the other. The doctrine precludes the assertion of inconsistent positions by confining a party to the position which he first adopts. Thus, a party asserting rights under a will, deed, or contract is estopped, by claiming under it, to attack any of its provisions. One who accepts the terms of an instrument must accept the same as a whole; one cannot accept part and reject the rest.

*Id.* at 19-20, 591 S.E.2d at 882-83 (cleaned up). "[T]he doctrine of election is used to prevent double redress for a single wrong." *Id.* at 20, 591 S.E.2d at 883 (internal marks and citation omitted).

### 3. *Estoppel Arises Here Because of the Benefit Conferred on Mr. Snow*

¶ 41 Seeking recovery of the bond premium for the original bond almost a year after receiving the benefit of the re-written bond amounts to taking fundamentally inconsistent positions in connection with the bond. Plaintiffs essentially seek to retain the benefit of Defendant's services without paying anything for this benefit. The relief requested by Plaintiffs thus conflicts not only "with the essential purpose

of quasi-estoppel, which is to prevent a party from benefitting by taking two clearly inconsistent positions[,]" *B & F Slosman*, 148 N.C. App. at 88, 557 S.E.2d at 181, but also the doctrine of election, which "prevent[s] double redress for a single wrong[,]" *Whitacre P'ship*, 358 N.C. at 20, 591 S.E.2d at 883.

¶ 42          Four days after Mr. Snow was arrested for allegedly violating the conditions of his pre-trial release, when Defendant caused a Surrender Form to be filed in Rockingham County Superior Court on 29 September 2017, Plaintiffs had a decision to make. The Surrender Form stated that it was for a pre-breach surrender. If that was true, then under N.C. Gen. Stat. § 58-71-20, Plaintiffs were entitled to return of the $1 million bond premium within 72 hours. Plaintiffs could have demanded that Defendant return the bond premium. If Plaintiffs were dissatisfied with Defendant for surrendering Mr. Snow on 29 September 2017, they could have sought out a new surety to post bond for Mr. Snow, anticipating the return of the bond premium within 72 hours and that the trial court would soon set new conditions of pre-trial release for Mr. Snow. And again, 72 hours after the Surrender Form was filed, having not received a return of the bond premium, if Plaintiffs or their counsel in fact believed that they were entitled to a return of the bond premium, the time was ripe to inform Defendant of that view. Neither Mr. Snow, nor anyone acting on his behalf, communicated in any way to Defendant that Mr. Snow believed he was owed $1 million by Defendant in late September 2017.

¶ 43    If any doubt lingered in the mind of Mr. Snow or his counsel about whether Plaintiffs were entitled to a return of the bond premium 72 hours after Defendant caused the Surrender Form to be filed in Rockingham County Superior Court, that doubt should have been removed when Judge Poovey denied the State's motion to revoke the conditions of Mr. Snow's pre-trial release on 4 October 2017. Judge Poovey's ruling that Mr. Snow had not violated the terms of his pre-trial release during the 2017 Florida trip should have vindicated any belief Plaintiffs had that they were entitled to a return of the bond premium by at least the day beforehand— 3 October 2017—after the 72 hours had elapsed. After all, the Surrender Form stated that it was for a pre-breach surrender, and the court had ruled that Mr. Snow had not, in fact, violated the conditions of his pre-trial release (and consequently, had not violated a condition of his bond), rejecting the State's argument to the contrary. Yet, even after Judge Poovey ruled that Mr. Snow had not violated the terms of his pre-trial release during the 2017 Florida trip, neither Mr. Snow, nor anyone acting on his behalf, informed Defendant that Plaintiffs believed they were entitled to a return of the bond premium—a return that by that point, was at least a day overdue.

¶ 44    Instead, the next day, on 5 October 2017, Mr. Snow was released from custody after Defendant re-wrote Mr. Snow's bond without charging an additional premium. Plaintiffs dispute whether Mr. Snow, or anyone acting on his behalf, expressly authorized Defendant to re-write the bond on 5 October 2017. However, it is

undisputed that Mr. Snow received the benefit of the re-written bond; he was released from custody the same day the bond was re-written. Moreover, "voluntariness is not an element under the doctrine of quasi estoppel." *Carolina Medicorp, Inc. v. Board of Trustees*, 118 N.C. App. 485, 493, 456 S.E.2d 116, 121 (1995).

¶ 45 The benefit Mr. Snow received from the re-written bond was substantial. *See, e.g.*, *Vill. of Pinehurst v. Reg'l Invs. of Moore, Inc.*, 330 N.C. 725, 730, 412 S.E.2d 645, 647 (1992) (noting that the benefit received must be substantial to support estoppel under a quasi-estoppel theory). In all, Mr. Snow was free on bail for nearly three years while the criminal charges against him were pending. He received the benefit of his bargain with Defendant. He chose to accept the benefit of the re-written bond without notifying Defendant within a reasonable amount of time that he believed he was entitled to a return of the bond premium for the original bond. He did not inform Defendant that he believed he was entitled to a return of the bond premium until 28 August 2018, a month after his criminal charges were resolved—almost a year after Defendant re-wrote his bond without charging him an additional premium.

¶ 46 As our Court has observed, "[a]s much as in any area of the law, quasi estoppel cases turn on the particular facts of each case." *Mayer*, 66 N.C. App. at 535, 311 S.E.2d at 668. Mr. Snow elected to accept the benefit of the re-written bond, paid no additional premium for the re-written bond, and failed to notify Defendant within a reasonable amount of time that he did not wish to receive this benefit. We hold that

Mr. Snow's receipt of the benefit of his bargain with Defendant by being returned to the same position he occupied before the suspected breach of the conditions of his pre-trial release, coupled with Plaintiffs' silence about their entitlement to a return of the bond premium or $15 million in collateral for almost a year, estops Plaintiffs from seeking return of the bond premium or any other relief requested in their verified complaint. By virtue of Plaintiffs' "acquiescence or acceptance of . . . benefits," Plaintiffs are "prevented from maintaining a position inconsistent with those acts." *Godley*, 306 N.C. at 361, 293 S.E.2d at 170. Accordingly, Plaintiffs' "acceptance of benefits precludes [their] subsequent inconsistent position[s]," even though arguably, Mr. Snow received the benefit of the re-written bond "involuntar[ily], . . . by necessity, or where . . . [he] voluntarily accept[ed] a benefit in order to avoid the risk of harm." *Shell Island Homeowners Ass'n*, 134 N.C. App. at 226, 517 S.E.2d at 413. Plaintiffs are therefore estopped from obtaining a return of the bond premium.

### 4. *Unjust Enrichment*

¶ 47      We note that a contrary holding would result in Plaintiffs' unjust enrichment. Indeed, recovery of any of the relief requested in Plaintiffs' verified complaint would result in a windfall to Mr. Snow.

¶ 48      "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated."

*Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761, *aff'd*, 312 N.C. 324, 321

S.E.2d 892 (1984).

> In order to establish a claim for unjust enrichment, a party
> must have conferred a benefit on the other party. The
> benefit must not have been conferred officiously, that is it
> must not be conferred by an interference in the affairs of
> the other party in a manner that is not justified in the
> circumstances. The benefit must not be gratuitous and it
> must be measurable. . . . A claim of this type is neither in
> tort nor contract but is described as a claim in quasi
> contract or a contract implied in law. A quasi contract or a
> contract implied in law is not a contract. The claim is not
> based on a promise but is imposed by law to prevent an
> unjust enrichment.

*Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) (citations omitted).

¶ 49    For example, in the doctrine's paradigmatic fact pattern—that of the mistaken

improver—our Supreme Court has observed,

> where one, under a mistake as to the location of his own
> premises, in good faith, and without inexcusable
> negligence, makes improvements upon the land of another,
> and the latter, knowing of the making of the improvements,
> but being himself ignorant of the mistake in location, fails
> to make objection, the improver may obtain suitable relief
> in equity.

*Rhyne v. Sheppard*, 224 N.C. 734, 737, 32 S.E.2d 316, 318 (1944). In the case of the

mistaken improver, the true owner "cannot retain a benefit which knowingly he has

permitted another to confer upon him by mistake[,]" and an owner who "stands by

and sees another erect improvements on the estate in good faith in the belief that he

has a right to do so, and does not interpose to prevent the work" will be estopped from "claim[ing] such improvements after they are erected." *Id.*

¶ 50      Plaintiffs stood by and watched Defendant in good faith return Mr. Snow to the position he occupied before the suspected breach of the terms of his pre-trial release without interposing to prevent Defendant from doing so. *See id.* After Defendant mistakenly rescinded the bond contract, Mr. Snow had "a choice of two remedies which proceed[ed] upon opposite and irreconcilable claims of right"—accept the restitution tendered to him by Defendant after learning of the mistake, or insist on a return of the bond premium when he did not receive it within 72 hours of the filing of the Surrender Form. *Whitacre P'ship*, 358 N.C. at 19, 591 S.E.2d at 883. The remedy chosen by Mr. Snow—acceptance of the benefit of the re-written bond, and return to the position he occupied before the suspected breach—"exclude[s] and bar[s] the prosecution of the other[,]" i.e., return of the bond premium. *Id.* By "preclud[ing] the assertion of inconsistent positions [and] confining a party to the position which he first adopts[,]" the doctrines of estoppel and election work to prevent Plaintiffs' unjust enrichment here. *Id.*

**D. Motion to Disqualify Plaintiffs' Expert and to Strike Expert Testimony**

¶ 51      Rule 702(a) of the North Carolina Rules of Evidence allows the use of expert testimony if the expert's knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 702(a) (2021).

An expert witness may only offer such testimony if

> (1)     The testimony is based upon sufficient facts or data.
>
> (2)     The testimony is the product of reliable principles and methods.
>
> (3)     The witness has applied the principles and methods reliably to the facts of the case.

*Id.*

¶ 52     "Generally, the trial court's decision to allow or disqualify an expert will not be reversed on appeal absent a showing of abuse of discretion." *Da Silva v. WakeMed*, 375 N.C. 1, 4, 846 S.E.2d 634, 638 (2020) (internal marks and citations omitted). "The standard of review remains the same whether the trial court has admitted or excluded the testimony—even when the exclusion of expert testimony results in summary judgment and thereby becomes outcome determinative." *Id.* at 4-5, 846 S.E.2d at 638 (internal marks and citations omitted). "However, when the pertinent inquiry on appeal is based on a question of law—such as whether the trial court properly interpreted and applied the language of a statute—we conduct de novo review." *Id.* at 5, 846 S.E.2d at 638.

¶ 53     Plaintiffs argue that disqualifying retired Judge James D. Llewellyn as an expert and striking his 27 July 2020 affidavit was erroneous. Judge Llewellyn was identified in Plaintiff's expert disclosures pursuant to Rule 26(b)(4) of the North Carolina Rules of Civil Procedure as an expert with

substantial experience pertaining to pretrial release of criminal defendants, including, *inter alia*, pretrial release conditions, violations of pretrial release, bail bonds, bail bondsmen, surety companies, bond forfeitures, surrenders of criminal defendants by the surety, premiums paid by defendants in connection with their bonds, motions by the State to have defendants' bonds revoked for violating their pretrial release conditions or other relief the State may seek, and matters addressed in N.C. Gen. Stat. 58-71-20.

(Emphasis in original.) Plaintiffs' Rule 26(b)(4) disclosure regarding Judge Llewellyn identified four opinions Judge Llewellyn intended to offer:

First, by virtue of Defendant's surrender of Mr. Snow, Mr. Snow's original bond was thereby terminated as a matter of law.

Second, by virtue of Judge Poovey's ruling on or about 4 October 2017 that denied the State's motion to revoke Mr. Snow's bond, the Defendant should have immediately returned all of Plaintiffs' 15 million dollars. Defendant's retainage of Plaintiffs' 15 million dollars until approximately ten (10) months later on or about 1 August 2018 was improper.

Third, by virtue of Judge Poovey's ruling on or about 4 October 2017 that denied the State's motion to revoke Mr. Snow's bond, Judge Poovey issued a new bond for Mr. Snow's pretrial release on the same terms as Mr. Snow's terminated original bond and Defendant's actions in connection with this second bond pertaining to Mr. Snow . . . were improper and unauthorized.

Fourth, by virtue of Judge Poovey's ruling on or about 4 October 2017 that denied the State's motion to revoke Mr. Snow's bond, the Defendant should have fully returned and fully refunded Plaintiff's bond premium of 1 million dollars, at the very least, within 72 hours after entry of Judge Poovey's ruling (thus, on or about 8 October

2017). Defendant's refusal ever since approximately 8 October 2017 to the present to return Plaintiffs' 1-million-dollar bond premium it received from Plaintiffs was and remains in violation of N.C. Gen. Stat. 58-71-20.

¶ 54 While Plaintiffs concede that an expert "may not testify that [] a particular legal conclusion or standard has or has not been met[,]" *State v. Smith*, 315 N.C. 76, 100, 337 S.E.2d 833, 849 (1985), they argue that the opinions in Plaintiffs' expert disclosures, the opinions offered by Judge Llewellyn during his deposition, and the opinions offered in the 27 July 2020 affidavit do not run afoul of this prohibition. We disagree.

¶ 55 Plaintiffs' Rule 26(b)(4) disclosure, Judge Llewellyn's deposition testimony, and the 27 July 2020 affidavit demonstrate that the *only* opinions Judge Llewellyn was prepared to offer were that "a particular legal conclusion or standard ha[d] or ha[d] not been met." *Smith*, 315 N.C. at 100, 337 S.E.2d at 849. These materials also demonstrate that these opinions were being offered solely on the basis of Judge Llewellyn's personal knowledge and experience as a 21-year North Carolina Superior Court Judge, which does not meet the requirements of Rule 702. Specifically, Judge Llewellyn's deposition testimony demonstrates that his opinions were not "based upon sufficient facts or data[,]" were not "the product of reliable principles and methods[,]" and did not demonstrate that the relevant "principles and methods [had been applied] reliably to the facts of the case[,]" as Rule 702 requires. N.C. Gen. Stat.

§ 8C-1, Rule 702(a) (2021). For example, Judge Llewellyn testified at his deposition that this was the first case in which he had been engaged as an expert witness on any subject; that he had never given any lectures or seminars to judges or attorneys on the subject of bail bonds; that he had never published any written work on bail bonds; that he had never peer reviewed any article or writing on bail bonds; that by the date of his deposition, he had not prepared any expert report; that the opinions identified in the Rule 26(b)(4) disclosure were the only opinions he intended to offer; and that these opinions were based only on application of North Carolina statutes to the facts of this case. We therefore hold that the trial court did not err, much less abuse its discretion, in disqualifying Judge Llewellyn as an expert and striking his testimony.

## III. Conclusion

We hold that Plaintiffs are estopped from recovering the bond premium because Defendant rescinded its bail contract with Mr. Snow because of a good faith mistake about whether Mr. Snow had breached a condition of his bond and, after learning of the mistake, re-wrote the bond and gave Mr. Snow the benefit of his bargain by waiving any additional premium. Mr. Snow elected to accept the benefit of the re-written bond and failed to notify Defendant within a reasonable amount of time that he did not wish to receive this benefit. We conclude that Mr. Snow's election to accept the benefit of the re-written bond precludes him from adopting the inconsistent position he has taken in this action, and that our holding prevents

Plaintiffs' unjust enrichment.

AFFIRMED.

Judges HAMPSON and CARPENTER concur.